UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

ESSIE TAYLOR, o/b/o Jaquan N. McCaster,

Plaintiff,

v.                                                    Case No.  5:04-cv-535-Oc-GRJ

JO ANNE B. BARNHART, Commissioner of
Social Security,

Defendant.
_____/

## ORDER

Essie Taylor, on behalf of her adopted grandson, Jaquan McCaster, appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for a period of children's Supplemental Security Income ("SSI") disability benefits.  (Doc. 1.)  The Commissioner has answered (Doc. 4), and both parties have filed briefs outlining their respective positions.  (Docs. 18 & 20.)  For the reasons discussed below the Commissioner's decision is due to be **AFFIRMED**.

## I.  PROCEDURAL HISTORY

Essie Taylor, on behalf of her adopted grandson,[1] protectively filed an application for children's SSI benefits on November 13, 2000, alleging that Plaintiff became disabled on April 14, 1999, due to developmental delays.  (R. 72-89, 117.)[2] Plaintiff's

---

[1]  Even though this action is being brought by Jacquan McCaster's adoptive grandmother on his behalf, the Court will refer to Jacquan as the Plaintiff.

[2]  Plaintiff was awarded SSI benefits effective July 1, 1998, which were later terminated on May 1, 2000 due to medical improvement.  (R. 15, 54-56, 68-71.)  Plaintiff was subsequently awarded SSI benefits November 15, 2004.  Accordingly, the period of time at issue is from November 13, 2000 through
(continued...)

application was denied initially (R. 66-67) and on reconsideration.  (R. 61-63.)  Plaintiff

timely requested a hearing before an administrative law judge ("ALJ") which was

conducted on December 4, 2002 in Ocala, Florida.  (R. 26-48.)  On June 26, 2003, the

ALJ issued a decision finding that the Plaintiff was not disabled, and thus, not  eligible

for SSI payments.  (R. 13-21.)  On July 8, 2003, Plaintiff requested review of the hearing

decision and submitted contentions and additional evidence.  (R. 377-443.) The Appeals

Council, on October 13, 2004, denied Plaintiff's Request for Review (R. 5-8), making the

ALJ's hearing decision the final decision of the Commissioner.[3]  On December 2, 2004,

Plaintiff filed a timely appeal to this Court.  (Doc. 1.)

## II.  THE STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[4]  Substantial evidence is more than a scintilla, i.e., the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[5]  In reviewing the Commissioner's decision, the district court must view the

---

[2](...continued)
November 14, 2004. (Doc. 19.)

[3] See 20 C.F.R. § 416.1481 (2003).

[4]See 42 U.S.C. § 405(g) (2003).

[5] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[6]

Congress has empowered the district court to affirm, modify, or reverse the decision of the Commissioner, with or without remanding the cause.[7]  Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[8]  The district court will reverse a Commissioner's decision on plenary review, however, if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[9]  Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled.[10]

## III.  THE LAW

The law considers a child disabled, for the purposes of children's SSI benefits, if that child has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death

---

[6] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[7] 42 U.S.C. § 405(g) (sentence four).

[8] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[9] Keeton v. Dep't of Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[10] Bowen v. Heckler, 748 F.2d 629, 631, 636-37 (11th Cir. 1994).

or which has lasted or can be expected to last for a continuous period of not less than 12 months."[11]  However, no child who "engages in substantial gainful activity . . . may be considered to be disabled."[12]  A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."[13]  The statute does not define "marked and severe functional limitations."

In determining the severity of impairments, the Commissioner must consider the combined effect and combined impact of all of the individual's impairments.[14]  In determining the disability of a child, the Commissioner must make reasonable efforts to ensure that a qualified pediatrician or other specialist evaluates the case.[15]

The Commissioner promulgates regulations governing eligibility for SSI benefits.[16]  On September 11, 2000, the Social Security Administration (SSA) published the final regulations governing childhood disability, which went into effect on January 2, 2001, replacing the interim regulations that had been in effect during the four years prior.[17]  Although the final regulations did not take effect until approximately a year and a half after the alleged onset of disability, they nonetheless control this Court's review of

---

[11] 42 U.S.C. § 1382c(a)(3)(C)(I) (2003).

[12] 42 U.S.C. § 1382c(a)(3)(C)(ii).

[13] 42 U.S.C. § 1382c(a)(3)(D).

[14] 42 U.S.C. § 1382c(a)(3)(G).

[15] 42 U.S.C. § 1382c(a)(3)(I).

[16] See 20 C.F.R. Pt. 416, Subpt I (2003); Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997).

[17] See 65 Fed. Reg. 54,747-01.

the Commissioner's decision.  The SSA's "Explanation of the Effective Date" explains

that the final regulations would apply "to the entire period at issue for claims that are

pending at any stage of [the] administrative review process, including claims that are

pending administrative review after remand from a Federal court."[18]  In the instant case,

the ALJ issued his final decision on June 26, 2003, after the final regulations took effect.

Thus, the Court will apply the final regulations in reviewing the Commissioner's decision.

In accordance with Congressional intent, the regulations define "marked and

severe functional limitations" as "a level of severity that meets, medically equals, or

functionally equals the listings."[19]  The regulations set forth a three-part sequential test

the Commissioner must follow when determining disability in children.[20]  First, the

Commissioner must find that the child is not performing substantial gainful activity.[21]

Second, if the child is not working, it must be found that the child suffers from an

impairment or combination of impairments that is severe.[22]  Third, if there are severe

impairments, it must then be found that the child's impairments meet, medically equal,

or functionally equal the listings.[23]  If the child does not meet all three criteria then the

child is not disabled.  In addition to the three-part test, the Commissioner must find that

---

[18] 65 Fed. Reg. 54,751.  The Second, Seventh, and Eighth Circuits have all held that the final regulations govern claimant's applications that were pending at any stage of administrative review at the time the final regulations went into effect.  Pollard v. Halter, 377 F.3d 183, 190-91 (2d Cir. 2004) (citing Garrett v. Barnhart, 366 F.3d 643, 647 (8th Cir. 2004); Keys v. Barnhart, 347 F.3d 990, 994 (7th Cir. 2003)).

[19] 20 C.F.R. § 416.902 (2003).

[20] 20 C.F.R. § 416.924(a) (2003).

[21] 20 C.F.R. § 416.924(b).

[22] 20 C.F.R. § 416.924(c).

[23] 20 C.F.R. § 416.924(d).

the child's impairment meets the duration requirement, which states the impairment must be expected to result in death or to last longer than 12 months.  If the child meets all three criteria and the duration requirement, then the child is disabled.[24]

Provisions for determining functional equivalence are established under 20 C.F.R. § 416.926a.  Stated generally, to functionally equal a listed impairment, a child must demonstrate an "extreme" limitation in one domain of functioning, or show a "marked" limitation in two domains of functioning.[25]  There are six domains of functioning to be considered: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being.[26]  A "marked" limitation in a domain means that the child's impairment "interferes seriously with [their] ability to independently initiate, sustain, or complete activities."[27]  An "extreme" limitation in a domain means that the child's impairment "interferes very seriously with [their] ability to independently initiate, sustain, or complete activities."[28]

## IV.  SUMMARY OF THE RECORD EVIDENCE

Plaintiff, born on April 14, 1998, was a four-year old child at the time of the hearing.  (R. 30, 72.)  At the hearing, Plaintiff testified that he likes going to school, that

---

[24] 20 C.F.R. § 416.924(d)(1).

[25] 20 C.F.R. § 416.926a(a) (2003) (all further references to 20 C.F.R. will be to the 2003 version unless otherwise specified).

[26] 20 C.F.R. § 416.926a(b).

[27] 20 C.F.R. § 416.926a(e)(2).

[28] 20 C.F.R. § 416.926a(e)(3).

he gets along with his teacher, and that he does not get into trouble, but that he has trouble understanding their instructions.  (R. 30, 33). Plaintiff testified that he has friends at school and at home. (R. 30.) Plaintiff testified that he is toilet trained and that he is able to put himself to bed, brush his teeth and get dressed.  (R. 33.)

Plaintiff's grandmother, Essie Taylor, testified that she thinks Plaintiff is disabled because of his hyperactivity and his breathing problem.  (R. 46.)  She reported that Plaintiff is "very hyper acted child," never sits down, is "always going," and that he has been "in disability school ever since the day he was born," specifically, Oakcrest School and Camelot Mental Health.  (R. 37.)  Ms. Taylor testified that she has to administer a nebulizer to Plaintiff for his breathing and that he takes medication of "Amerall," Zyrtec, and Remeron.  (R. 31, 37, 42, 46.)  She testified that Plaintiff coughs day and night.  (R. 42.)

She disagreed with much of Plaintiff's testimony.  With respect to school, Ms. Taylor testified that Plaintiff stays in trouble, that he throws toys and chairs and gets in fights with other children.  (R. 35, 37, 38.) She testified that Plaintiff does not have friends at home because "of his hyper that's you know, been fights every time." (Id.) With respect to caring for himself, Ms. Taylor testified that Plaintiff will not go to bed unless she puts him in and that he sleeps with her because she does not trust him at night in his room (R. 40); that he wets himself about every two days (R. 41); and that she has to dress him because "he's just stand up with his clothes in his hand."  (R.44.)

 Ms. Taylor confirmed that Plaintiff can count from one to ten but that she has never heard him say the alphabet.  (R. 44.)  She testified that he plays with remote controls more than toys. (R. 44.)  At the close of the hearing, counsel requested that

Plaintiff undergo an IQ test and a "child development test . . . to confirm his hyperactivity and his delayed learning." (R. 47.)

Medical records in evidence dated through December 1999 document Plaintiff's developmental delay due to premature birth at 25 weeks and his need for a GI feeding tube.  (R. 181-229, 234-57, 262-66, 325-27.)    On October 5, 1999, Kim Kazimour, Ph.D., evaluated Plaintiff, then 17 months chronologically (14 months old adjusted chronological age), using the Bayley Scales of Infant Development II.  (R. 264-66.)  Dr. Kazimour found that Plaintiff's cognitive skills were in the 10 to 11 month range; his motor skills were in the 9 to 11 month range; and that his overall development, "across skill areas, appeared to be in the nine to eleven month age range." (R. 264.)  A December 9, 1999 physical therapy evaluation noted that Plaintiff had "mild developmental delays" with gross motor skills in the 16-19 month range.  (R. 325-27.)

On October 31, 2000, Kim Kazimour, Ph.D., evaluated Plaintiff, then 30 months old, using the Bayley Scales of Infant Development II.  (R. 262-63.)  She noted that Plaintiff continued to be delayed in his overall development, but that he was making good progress.  Specifically, Dr. Kazimour found that Plaintiff's cognitive, social, adaptive and communications skill development were in the 22-24 month age range, while his motor skill development was in the 25-26 month age range.

Plaintiff participated in speech therapy, occupational therapy and physical therapy.  (R. 277-327.)  In January 2001, Plaintiff was dismissed from the Physical and Occupational Therapy programs due to improvement in age appropriate fine and oral motor skills.  (R. 277-79.)

The school records include a diary dated from August 27, 2002 through October 8, 2002, with ten entries reflecting instances of misbehavior, including hitting teachers, disturbing other children, screaming and crying.  (R. 167-68.)  Additionally, on May 20, 2002, Mrs. McKenna, Plaintiff's pre-kindergarten teacher noted that 2-5 times per day Plaintiff exhibited "moderate (screaming, drumming fees, lasts 20-30 minutes) and severe (screaming, cursing, throwing chairs, shoes, almost anything he can reach, lasts 40-50 minutes or longer)" misbehavior. (R. 151.) She further noted that Plaintiff uses inappropriate language daily and that he hits or kicks children and adults without provocation, sometimes quite hard.  (Id.)  Finally, Mrs. McKenna reported that in between these behaviors Plaintiff "is very pleasant and often willing to please." (Id.)  In October 2002, Ms. Boone wrote letters to Ms. Taylor regarding Plaintiff's behavior at school, including hitting her, knocking things off the table, overturning chairs and pushing other children.  (R. 162-66.)  Records from Twig Benders Day Treatment Program noted that from November 9, 2002 through December 13, 2002, Plaintiff had several "good" or "okay" days and also days when he would not listen or follow directions.  (R. 169-78.)

On February 18, 2003, David M. Bortnick, Ph.D, Psy.D. performed an intellectual and mental status evaluation.  (R. 373-75.)  Ms. Taylor provided information about Plaintiff's history and current status, but Plaintiff was seen alone.  (R. 373.)  Dr. Bortnick noted that Plaintiff was friendly and cooperative and alert and oriented.  (R. 374.)  He further noted that Plaintiff was active, curious, and inquisitive but was able to pay attention, concentrate, follow-directions, and learn new material.  (*Id.*)  Dr. Bortnick

noted that Plaintiff understand his questions, responded openly and honestly, and made a genuine attempt to do his best work. (*Id.*)

Dr. Bortnick administered the Wechsler Preschool and Primary Scale of Intelligence-Revised and Plaintiff's Verbal IQ was 91 (average range), his performance IQ was 85 (low average range) and his Full Scale IQ was 87 (low average range.)  (R. 374-75.)   Dr. Bortnick noted that Plaintiff performs self-care activities independently (i.e., dressing, bathing, feeding, etc.) but that his grandmother "has to tell him when to eat and get --dressed."  (R. 375.)  He further noted that Plaintiff was toilet trained; that after school Plaintiff "comes home and plays with his toys or goes outside and plays with his toy-cars"; and that the other kids in the neighborhood are combative and don't get along with him.  (*Id.*)  Dr. Bortnick noted that Plaintiff likes to watch tv, color and he accompanies his grandmother on errands and to church on sundays.  (*Id.*)  Dr. Bortnick diagnosed Plaintiff with "ADHD by History In Partial Remission."  (*Id.*)  Dr. Bortnick completed a childhood functional assessment form and found that Plaintiff has "less than marked" limitations in attending & completing tasks and in interacting & relating with others and no limitations in acquiring & using information, moving about & manipulating objects, self care, and health & physical well-being. (R. 376.)

In evaluating the Plaintiff's application for SSI, the Commissioner employed three different reviewers to complete a Childhood Disability Evaluation Form (the "Form") about the Plaintiff.  The first Form, which was completed on September 22, 1998, reflects that Plaintiff's physical and mental impairments functionally equal Listing 100.02.  (R. 230-33.)  The second Form, completed on May 3, 2000, shows that Plaintiff has severe impairments, but that those impairments do not meet, medically equal, or

functionally equal the severity of a listing.  (R. 258-61.)  Additionally, the second Form

reflects less than marked limitation in the cognitive/communicative and motor areas of

functioning; and no evidence of limitation in the social area of functioning. (R. 260.)  The

third Form, completed on January 24, 2001, shows that Plaintiff has severe

impairments, but that those impairments do not meet, medically equal, or functionally

equal the severity of a listing.  (R. 267-73.) Additionally, the third Form notes less than

marked limitations in acquiring and using information; interacting and relating with

others; moving about and manipulating objects; caring for yourself; and health and

physical well-being.  (R. 270-71.)

## V.  **DISCUSSION**

Plaintiff raises three issues on  appeal.  First, Plaintiff argues that the ALJ

committed reversible error by failing to make any credibility determinations regarding

Ms. Taylor's testimony. Second, Plaintiff contends that the ALJ's finding that the opinion

of Dr. Bortnick is consistent with the totality of the evidence was not based on

substantial evidence.  Third, Plaintiff contends that the Appeals Council committed

reversible error by failing to remand this matter to the ALJ for consideration of newly

submitted evidence.   For the following reasons, all three arguments must be rejected.

### A.    **Ms. Taylor's Testimony**

Plaintiff contends that the ALJ committed reversible error by failing to make any

credibility determination regarding the testimony of the Plaintiff's grandmother.  Plaintiff

argues that a finding of credibility was critical in this case because Ms. Taylor is the one

person who is most familiar with Plaintiff's functioning.

Plaintiff cites several cases for the proposition that the ALJ was required to make a credibility determination as to Ms. Taylor because her testimony was "critical" to the outcome of this case. [29]   Even assuming that this is the law,  Ms. Taylor's testimony is much different from the "critical" testimony that was presented in <u>Reese by and through Reese v. Barnhart</u>, [30] and <u>Tieniber v. Heckler</u>.[31]   In <u>Reese</u> the Eleventh Circuit found that the testimony of the child claimant's mother as to whether the claimant was the son of a deceased wage earner was critical evidence. In <u>Tieniber</u>  the Eleventh Circuit found that the testimony of the claimant and her daughter was critical because their subjective testimony was the only direct evidence produced relevant to the alleged period of disability.

While Ms. Taylor's testimony was relevant and material, it was by no means critical to the outcome of the case.  As discussed above, the ALJ considered other available evidence including the testimony of the Plaintiff himself, the Plaintiff's medical and school records and the report of Dr. Bortnick.  Thus, unlike <u>Tieniber</u>, Ms. Taylor's testimony was not the only evidence form the period of disability and unlike <u>Reese</u>, Ms. Taylor's testimony was not the critical and only evidence of the key issue in the case.  Thus, while Ms. Taylor is undoubtedly familiar with Plaintiff's functioning, she is not the only person in a position to comment on his condition.

---

[29] <u>See</u> <u>Reese by and through Reese v. Barnhart</u>, Case No. 02-13960-GG, slip op. (11th Cir. Jan. 15, 2003)(per curiam); <u>Tieniber v. Heckler</u>, 120 F.2d 1251 (11th Cir. 1983).<u>Foote v. Chater</u>, 67 F.3d 1553 (11th Cir. 1995)

[30] <u>Reese by and through Reese v. Barnhart</u>, Case No. 02-13960-GG, slip op. (11th Cir. Jan. 15, 2003)(per curiam).  A copy of this case is attached to Plaintiff's memorandum.

[31] <u>Tieniber v. Heckler</u>, 120 F.2d 1251 (11th Cir. 1983)

Moreover, a review of the ALJ's decision discloses that he did make a credibility determination.  Pursuant to Eleventh Circuit law, the ALJ "must either explicitly discredit the subject testimony or the implication must be so clear as to amount to a specific credibility finding."[32]   Here, although the ALJ did not make an explicit finding regarding the credibility of Ms. Taylor's testimony the ALJ did state - immediately after reviewing the testimony of both Plaintiff and Ms. Taylor - "[a]fter reviewing all the evidence including the testimony at the hearing, the undersigned gives significant weight to the evidence from Dr. Bortnick . . ." (R. 18.)  As such, the implication that the ALJ discredited Ms. Taylor's testimony based on the findings in Dr. Bortnick's report is "so clear as to amount to a specific credibility finding."[33]

Thus, the Court finds that the ALJ made appropriate credibility findings as to Ms. Taylor. Because the credibility finding meets the standard set by the Eleventh Circuit, it is not a reason to disturb the ALJ's decision.

### B.    Dr. Bortnick's Opinion

Plaintiff argues that the ALJ's finding with regard to Dr. Bortnick's assessment, that Plaintiff's ability was consistent with the totality of the evidence in the case, was not based on substantial evidence.  Specifically, Plaintiff contends that Dr. Bortnick based his findings primarily on the statements of a four-year old child and he did not review Plaintiff's medical or school records.

---

[32] Id. at 1255.

[33] Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995).

13

As an initial matter, according to Dr. Bortnick's report, Ms. Taylor provided information about Plaintiff's condition.  Dr. Bortnick notes that Plaintiff was brought to the office "by his grandmother who provided information about his history and current-status but was seen alone."  (R. 373.)  Nevertheless, Plaintiff argues that if Ms. Taylor would have attended the session, she would have corrected Plaintiff's "many misstatements, which Dr. Bortnick then relied on in rendering his opinion." (Doc. 18, page 14.)  Plaintiff only identifies one alleged misstatement in its memorandum -- i.e., Plaintiff told Dr. Bortnick that he performs self-care activities by himself and that he is toilet trained, when Ms. Taylor testified that Plaintiff "wets himself 'about every two days'" and that she sends extra clothes to school with him and that she has to dress him.  Even assuming that Ms. Taylor would have corrected this alleged misstatement, it would not support a finding that Plaintiff had marked or severe limitations in any of the domains.

Next, Plaintiff argues that Dr. Bortnick's findings were not consistent with the school records.  While these records reflect instances of misbehavior, they also reflect periods of acceptable and appropriate behavior.  In a letter dated May 20, 2002, Mrs. McKenna, Plaintiff's pre-kindergarten teacher noted misbehavior on a regular basis but that otherwise Plaintiff "is very pleasant and often willing to please." (R. 151.)  Mrs. McKenna further noted that Plaintiff "is curious and has questions about everything.  He likes to talk and would rather talk than eat sometimes.  He talks quickly but clearly and is interested in a variety of subjects." (Id.)

The school records also include a diary dated from August 27, 2002 through October 8, 2002, documenting Plaintiff's misbehavior.  However, the diary, which covers

a six-week period, only has 10 entries.  Moreover, while a few of entries document instances where Plaintiff hit a teacher or fellow student, other entries are more innocuous -- i.e., on September 9, 2002, Plaintiff was not listening and following directions, he was very stubborn and falling on the floor screaming; on October 4, 2002 Plaintiff cried and screamed for no reason for about 10 minutes and then he was fine.

Additionally, records from Twig Benders Day Treatment Program noted instances of misbehavior but also noted that Plaintiff had several "good" or "okay" days. (R. 169-78.)  On November 9, 2002, Plaintiff exhibited "just a little" aggressive and defiant behavior and "pretty much" followed directions, interacted with peers, responded to prompting and redirection from staff, and participated in activities.  (R. 179.)  On November 21, 22 and 25, 2002, Plaintiff exhibited no aggressive behavior and no or "just a little" defiant and hyperactive behavior and  "pretty much" followed directions, interacted with peers, responded to prompting and redirection from staff, used appropriate language and tone with peers and staff, transitioned into activities well, participated in activities and displayed age appropriate behaviors.  (R. 174-76.)

These school records, together with the evidence as a whole, do not support a finding that Plaintiff had marked or severe limitations in any of the domains.  Indeed, the evidence is consistent with Dr. Bortnick's findings that Plaintiff had a less than marked functional limitation in attending and completing tasks and in interacting and relating with others and no functional limitations in acquiring and using information, moving about and manipulating objects, self-care, or in physical health and well-being. Accordingly, the ALJ's finding that Dr. Bortnick's assessment is consistent with the totality of the evidence is supported by substantial evidence.

### C.    Appeals Council

Plaintiff argues that the Appeals Council erred by denying Plaintiff's request for review after he submitted new evidence.[34]  Plaintiff submitted copies of records from Boris Kawliche, M.D. dated October 14 and November 4, 2003 and Marion County School records dated from March 4 to May 13, 2003.   (R. 395-443.)

When the Appeals Council denies review as it did here, the decision of the ALJ becomes the final decision of the Commissioner.[35]  Furthermore, the evidence which was presented to the Appeals Council and not presented to the ALJ (*i.e.*, the new evidence) is incorporated into the record on appeal,[36] and is properly considered by the court where  the claimant appeals the Appeals Council's decision to deny review.[37] Conversely, it would be improper for the court to consider the new evidence where the claimant appeals only the ALJ's decision to deny benefits.[38]

Here, because Plaintiff directly challenges the decision of the Appeals Council denying review of her case, Plaintiff must make a three-part showing to establish that remand is appropriate. First, she must show that new, non-cumulative evidence exists.

---

[34] See Doc. 16, pages 18-19.

[35] Falge v. Apfel, 150 F. 3d 1320, 1322 (11th Cir. 1998) *Citing* Keeton v. Dept. of Health and Human Servs., 21 F. 3d 1064, 1066 (11th Cir. 1994).

[36] Id.

[37] See Baguer v. Apfel, 65 F. Supp 2d 1345, 1354 (M.D. Fla. 1999)("The Commissioner cannot avoid judicial review of the Appeals Council's decision to deny review by considering but not acting on new evidence that is highly probative of disability, or by considering by not acting on evidence that shows in retrospect that the ALJ's action, findings, or conclusions are contrary to the weight of the evidence currently of record.")

[38] Falge at 1323. "[...] this will be our rule: when the AC has denied review, we will look only to the evidence actually presented to the ALJ *in determining whether the ALJ's decision is supported by substantial evidence.*" (emphasis added).

Second, she must show that the evidence is material such that a reasonable possibility exists that the new evidence would change the administrative result. Finally, she must demonstrate that good cause exists for her failure to submit the evidence at the appropriate administrative level.[39]  Although Plaintiff discusses the substance of the new evidence, she fails to make an adequate showing as to why this "evidence" is material or how it could have reasonably changed the administrative result.

With respect to Dr. Kawliche's records, Plaintiff argues that Dr. Kawliche's diagnosis of ADHD is significant because it is contrary to Dr. Bortnick's conclusory statement that Plaintiff has "ADHD By History In Partial Remission."  However, the diagnosis of ADHD alone does not establish marked or severe functional limitations.[40] Moreover, while Dr. Kawliche noted that Plaintiff was "a little more aggressive lately in kindergarten and this has caused some problems, complaints about his behavior," he also noted that Plaintiff was still having some of the same behavioral problems (i.e., paying attention, staying focused) from the previous year when he was in the Twig Benders Program.  In addition, Dr. Kawliche noted that Plaintiff "seems able to learn okay," was making friends, sleeps fine, eats okay and noted no reports of any odd or strange behavior.

With respect to the additional school records, Plaintiff only refers to a few of the records.  First, Plaintiff refers to a form dated April 4, 2004 in which his teacher, Mrs. Mowery, rated his behaviors as extreme, moderate or mild.  (R. 404.)  Plaintiff also

[39] Falge at 1323. Citing Cannon v. Bowen, 858 F. 2d 1541 (11th Cir. 1988).

[40] See Higgs v. Bowen 880 F.2d 860, 863 (6th Cir. 1988)(noting that "[t]he mere diagnosis [of a condition], of course, says nothing about the severity of the condition.")

notes that his educational plan was to provide accommodations such as: "close proximity to the student when giving directions or presenting lessons; lessons broken into smaller segments; and extra time for processing/responding, for exams, and for assignments. (R. 405.)  The records also include an April 1, 2004, psychological evaluation and assessment performed by  Lisa Stringfellow, Ed.S., Licensed & Certified School psychologist. (R. 408-13.)   Ms. Stringfellow noted that since Plaintiff had been enrolled at Ocala Springs Elementary School, his behavior "appears to have improved and he is making progress in [Mrs. Mowery's] classroom." (R. 409.) Ms. Stringfellow noted that based on test results, his overall intellectual functioning fell within the below average range; his academic skills fell within the low range; and his information processing fell within the low range with inability to complete one of the subtests.  She further noted that a Developmental Profile II, completed by Mrs. Mowery revealed that Plaintiff was delayed in all areas assessed, including physical age, self-help age, social age, academic age, and communicative age and a Behavior Assessment System for Children showed that he was in the "at-risk range"[41] for behavioral symptoms, externalizing problems and adaptive skills.

Other than discussing the content of these several school records, Plaintiff failed to explain why this "evidence" is material or how it could have reasonably changed the administrative result.  Much of the evidence is consistent with the school records before the ALJ.  Moreover, the additional evidence does not establish that Plaintiff has marked or severe limitations in any of the domains (nor does Plaintiff argue that it does.)

---

[41] Scores in the "at-risk range" identify either a significant problem whose severity may not currently require treatment or an area that has the potential of becoming problematic. (R. 412.)

Accordingly, Plaintiff has failed to show that a reasonable possibility exists that the new evidence would have changed the administrative result and therefore the Court concludes that the Appeals Council did not err by denying review of Plaintiff's case.

## VI.  CONCLUSION

In view of the foregoing, it is hereby **ORDERED** that the decision of the Commissioner is **AFFIRMED**.  The Clerk is directed to enter judgment accordingly and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on this 13th day of March, 2006.

GARY R. JONES
United States Magistrate Judge

Copies to:
All Counsel

19